Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**Civil Action No. 09-CV-01862-ZLW-MEH**

**WILDEARTH GUARDIANS,**

    **Plaintiff,**

**v.**

**PUBLIC SERVICE COMPANY OF COLORADO**
**d/b/a XCEL ENERGY,**

    **Defendant.**

---

## DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION TO PLAINTIFF AND SECOND SET OF INTERROGATORIES TO PLAINTIFF

---

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendant Public Service Company of Colorado d/b/a Xcel Energy ("PSCo") hereby requests that WildEarth Guardians ("Plaintiff") answer the Requests for Admission set forth below within the time and in the manner prescribed by the Federal Rules of Civil Procedure and the applicable case management order.

Each of the matters of which an admission is requested shall be deemed admitted unless the party to whom the request is directed serves or causes to be served to the party requesting the admissions, or its attorney of record, a statement within such time as the Court may allow, either denying specifically the matters of which an admission is requested or setting forth in detail the reasons why it cannot truthfully admit or deny those matters. Any admission made pursuant to

this request is for the purpose of this pending action only and does not constitute an admission

for any other purpose and may not be used against you in any other proceeding.

YOU ARE FURTHER ADVISED that if these matters are not admitted, and the same are

thereafter proved, PSCo will apply to the Court pursuant to Rule 37(c) of the Federal Rules of

Civil Procedure, for reimbursement by you of the reasonable expenses, including attorneys' fees,

incurred to prove the same.

### INSTRUCTIONS

1.      The terms "and" and "or" are to be read conjunctively and disjunctively.

2.      Any verb used in any tense means such verb in all of its tenses.

3.      The singular includes the plural and vice versa.

4.      A masculine, feminine or neuter pronoun includes all other genders.

5.      If your response to any request for admission is not an admission, the response

must specifically deny the matter or set forth in detail the reasons why you cannot truthfully

admit or deny the statement.

6.      If your response to any request for admission is an objection, the reasons for the

objection must be fully stated.

7.      If you can admit only part of any request for admission, state specifically what

portion of the request you are admitting and what portion of the request you are denying.

8.      If, in answering these Requests for Admissions, you encounter any ambiguity in

construing a request, or a definition or instruction relevant to the inquiry contained therein, set

forth the matter deemed "ambiguous" and set forth the construction chosen or used in answering

the request.

9.      You may not give lack of information or knowledge as a reason for failure to admit or deny unless you have made a reasonable inquiry, and the information known or readily available to you is insufficient to admit or deny the matter for which an admission is requested.

10.     In answering these Requests for Admissions, furnish such information as is available to you, not merely such information as is within your knowledge. This means that you are to furnish information that is known by, available to or in the possession of your employees, representatives, servants or agents, including your attorney or any agent or investigator for you or your attorney (unless privileged).

## DEFINITIONS

1.      "CAA" or the "Act" means the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, as amended, and all rules and regulations promulgated thereunder.

2.      "Colorado Department of Public Health and Environment" or "CDPHE" means the agency responsible for oversight of Colorado's environmental regulations (including air quality regulations, the Colorado SIP, and Title V permits issued by Colorado) and any of its present or former officers, directors, executives, employees, agents, attorneys, departments, sub-agencies, offices, divisions, affiliates, commissions, and all other persons acting or purporting to act on its behalf

3.      "Cherokee Station" or "Cherokee" means the Cherokee Station electric generation plant, including Electric Generating Units 1, 2, 3, and 4, located in Denver, Adams County, Colorado.

4.       "Colorado" or "the State" means the State of Colorado, and any of its present or former officers, directors, executives, employees, agents, attorneys (including the Attorney

General of the State of Colorado or counsel for any other entity of the State of Colorado), departments, agencies, offices, divisions, affiliates, commissions (*e.g.*, public service commission, public corporations, public benefit corporations, and all other persons acting or purporting to act on its behalf), including but not limited to the Colorado Department of Public Health and Environment ("CDPHE") .

5.      "Colorado SIP" means the state implementation plan adopted by Colorado pursuant to Section 110 of the CAA, 42 U.S.C. §7410, as submitted to and/or approved by the EPA as set forth in 40 C.F.R. Part 52.

6.      "Complaint" means the Complaint filed by Plaintiff in this action on August 6, 2009.

7.      "Continuous Opacity Monitoring System" or "COMS" means the opacity monitors installed at each unit at the Cherokee Station and associated data acquisition and handling systems.

8.      "Defendant" means Public Service Company of Colorado d/b/a Xcel Energy ("PSCo").

9.       "EPA" means the United States Environmental Protection Agency (including the Administrator of the United States Environmental Protection Agency), its headquarters, offices, regions, departments, agencies, and its present and former officers, executives, directors, employees, agents, attorneys, and affiliates, and all other persons acting or purporting to act on its behalf.

10.      "Monitor Downtime" or "COMS Downtime" means any time the COMS for any particular unit is not operating or is operating but is not recording valid monitoring data during a

period when the relevant unit is combusting fuel or during the time following combustion when fans are still operating for the purposes of cooling down the boiler or prior to combustion when fans are operating for the purpose of starting the unit.

11.    "Opacity" means the degree to which particulate matter emissions reduce the transmission of light and obscure the view of an object in the background.  For purposes of these Requests for Admission, "Opacity" means a measure of the degree to which the transmittance of light is reduced by the exhaust gas of the boilers.

12.    "Opacity Exceedance" means any 6-minute period during which the emissions into the atmosphere from Cherokee Station Units 1-4 are in excess of the applicable Opacity limits identified in Conditions 11.1 or 11.2 of CDPHE Title V Operating Permit 960PAD130, as measured using valid COMS data, or in certain situations, EPA Reference Method 9 or an "Operating Report During Monitor Unavailability."  Defendant further clarifies that an "Opacity Exceedance" is not, in and of itself, a violation of any statute, regulation or permit condition

13.    "Operating" or "Operation," when used in relation to a Unit at the Cherokee Station, means the combustion of fuel.

14.    "Person" includes natural persons, corporations, partnerships, associations, joint ventures, and any other business enterprise or legal entity, and includes both the singular and the plural.

15.    "Plaintiff" means, collectively, WildEarth Guardians and Rocky Mountain Clean Air Action.

16.    "Relevant Period" means the period from August 6, 2004 through August 6, 2009.

17.    "Unit" means any one of the four Electric Generating Units (1, 2, 3, and 4) at the

Cherokee Station.

18.    "You" or "your" means WildEarth Guardians and Rocky Mountain Clean Air Action, including any present and former officers, administrators, managers, directors, employees, agents, members, attorneys, offices, divisions, affiliates of either entity, and all other persons acting or purporting to act on their behalf.

19.    Terms not specifically defined herein shall have the meaning ascribed to them by the CAA, as amended, and all rules and regulations promulgated thereunder.

## REQUESTS FOR ADMISSION

1.  Please admit that the CDPHE, Air Pollution Control Division, conducted field inspections of the Cherokee Station during the following years (see previously produced Air Pollution Control Division, Field Inspection Reports, labeled as XCEL 70909-70979):

    a.  2003

    b.  2004

    c.  2005

    d.  2006

    e.  2007

    f.  2008

In responding to this Request, please treat each of the years delineated above (as subparts a - f) as distinct and separate admissions.

RESPONSE:

2. Please admit that each field inspection of the Cherokee Station conducted by the CDPHE, Air Pollution Control Division, during the following years included an inspection and/or review of the COMS data (see previously produced Air Pollution Control Division, Field Inspection Reports, labeled as XCEL 70909-70979):

    a.  2003

    b.  2004

    c.  2005

    d.  2006

    e.  2007

    f.  2008

In responding to this Request, please treat each of the years delineated above (as subparts a - f) as distinct and separate admissions.

RESPONSE:


3. Please admit that Defendant submitted an Excess Emissions Report ("EER") to the State of Colorado for the Cherokee Station during each of the following quarters:

    a.  Third Quarter, 2004

    b.  Fourth Quarter, 2004

    c.  First Quarter, 2005

    d.  Second Quarter, 2005

    e.  Third Quarter, 2005

    f.  Fourth Quarter, 2005

    g.  First Quarter, 2006

    h.  Second Quarter, 2006

    i.  Third Quarter, 2006

    j.  Fourth Quarter, 2006

    k.  First Quarter, 2007

    l.  Second Quarter, 2007

    m.  Third Quarter, 2007

    n.  Fourth Quarter, 2007

    o.  First Quarter, 2008

    p.  Second Quarter, 2008

    q.  Third Quarter, 2008

    r.  Fourth Quarter, 2008

    s.  First Quarter, 2009

    t.  Second Quarter, 2009

    u.  Third Quarter, 2009

In responding to this Request, please treat each of the quarters delineated above (as subparts a - u) as distinct and separate admissions.

RESPONSE:

4.  Please admit that each Excess Emissions Report listed in Request 3 was signed by Defendant or Defendant's authorized representative.

RESPONSE:

5.  Please admit that each Excess Emissions Report listed in Request 3 was submitted in a format that was approved by CDPHE.

RESPONSE:

6.  Please admit that Defendant submitted supplements or revisions to the State of Colorado for EERs submitted for the following periods:

   a.  Third Quarter, 2005 (see previously produced email from Chad Campbell to Scott Patefield, dated January 5, 2006, labeled XCEL 00000414)

   b.  Fourth Quarter, 2006 (see previously produced Revised EER cover letter, labeled XCEL 00000704)

   c.  Second Quarter, 2007 (see previously produced Revised EER cover letters, labeled XCEL 00000861-862 and XCEL 00000939)

   d.  Third Quarter, 2008 (see previously produced Revised EER cover letters, labeled XCEL 00001252-1254 and XCEL 00018353-18354)

In responding to this Request, please treat each of the EER supplements delineated above (as subparts  a - d) as distinct and separate admissions.

RESPONSE:

7.  Please admit that each EER supplement listed in Request 6 was signed by Defendant or an employee of Defendant.

RESPONSE:

8. Please admit that Defendant submitted to the State of Colorado Semi-Annual Monitoring
   and Permit Deviation Reports for the Cherokee Station addressing operations during each
   of the following periods:

   a. 2004, Second Half (see previously produced Cherokee Station Semi-Annual
      Monitoring and Permit Deviation Report, labeled as XCEL 00002100 - 2104)

   b. 2005, First Half (see previously produced Cherokee Station Monitoring and
      Permit Deviation Report, labeled as XCEL 00002105 - 2109)

   c. 2005, Second Half (see previously produced Cherokee Station Semi-Annual
      Monitoring and Permit Deviation Report, labeled as XCEL 00002110 - 2114)

   d. 2006, First Half (see previously produced Cherokee Station Semi-Annual
      Monitoring and Permit Deviation Report, labeled as XCEL 00002115 - 2119)

   e. 2006, Second Half (see previously produced Cherokee Station Semi-Annual
      Monitoring and Permit Deviation Report, labeled as XCEL 00002120 - 2124)

   f. 2007, First Half (see previously produced Cherokee Station Semi-Annual
      Monitoring and Permit Deviation Report, labeled as XCEL 00002125 - 2130 and
      revised Cherokee Station Monitoring and Permit Deviation Reports, labeled as
      XCEL 00002131 - 2142)

   g. 2007, Second Half (see previously produced Cherokee Station Semi-Annual
      Monitoring and Permit Deviation Report, labeled as XCEL 00002143 - 2147)

   h. 2008, First Half (see previously produced Cherokee Station Semi-Annual
      Monitoring and Permit Deviation Report, labeled as XCEL 00002148 - 2152)

   i. 2008, Second Half (see previously produced Cherokee Station Semi-Annual

Monitoring and Permit Deviation Report, labeled as XCEL 00002153 - 2156)

j.  2009, First Half (see previously produced Cherokee Station Semi-Annual
Monitoring and Permit Deviation Report, labeled as XCEL 00002157 - 2160)

k.  2009, Second Half

In responding to this Request, please treat each of the semi-annual reports delineated above
(as subparts a - k) as distinct and separate admissions.

RESPONSE:

9.  Please admit that each Cherokee Station Semi-Annual Monitoring and Permit Deviation
Report listed in Request 8 was signed and certified by Defendant or Defendant's
authorized representative.

RESPONSE:

10. Please admit that Defendant submitted Annual Compliance Certification Reports to the
State of Colorado for the Cherokee Station for each of the following years:

a.  2004

b.  2005 (see previously produced Cherokee Station Annual Compliance
Certification Report, labeled as XCEL 00002079 - 2083)

c.  2006 (see previously produced Cherokee Station Annual Compliance
Certification Report, labeled as XCEL 00002084 - 2087)

d.  2007 (see previously produced Cherokee Station Annual Compliance
Certification Report, labeled as XCEL 00002088 - 2091)

e.  2008 (see previously produced Cherokee Station Annual Compliance
Certification Report, labeled as XCEL 00002092 - 2095)

f.  2009 (see previously produced Cherokee Station Annual Compliance
Certification Report, labeled as XCEL 00002096 - 2099)

In responding to this Request, please treat each Annual Compliance Certification Report
delineated above (as subparts a - e) as a distinct and separate admission.

RESPONSE:

11. Please admit that each Cherokee Station Annual Compliance Certification Report listed
in Request 10 was signed and certified by Defendant or Defendant's authorized
representative.

RESPONSE:

12. Please admit that Defendant submitted an Upset Condition Reporting Form to the State of
Colorado related to Opacity Exceedances at the Cherokee Station for the following units
on the following dates:

a.  November 13, 2004 - Unit 4

b.  December 23, 2004 - Unit 3

c.  December 27, 2004 - Unit 3

d.  January 7, 2005 - Unit 3

e.  March 15, 2005 - Unit 3

f.  April 10, 2005 - Unit 3

12

g.  July 14, 2005 - Unit 1

h.  July 29, 2005 - Unit 4

i.  November 7, 2005 - Unit 4

j.  November 18, 2005 - Unit 1

k.  December 9, 2005 - Unit 1

l.  January 7, 2006 - Unit 2

m.  June 15, 2006 - Unit 1

n.  June 16, 2006 - Unit 1

o.  September 13, 2006 - Unit 1

p.  December 30, 2006 - Unit 3

q.  January 23, 2007 - Unit 4

r.  February 2, 2007 - Unit 4

s.  April 3, 2007 - Unit 4

t.  April 6, 2007 - Unit 3

u.  April 27, 2007 - Unit 4

v.  June 20, 2007 - Unit 4

w.  July 23, 2007 - Unit 3

In responding to this Request, please treat each Upset Condition Reporting Form delineated

above (as subparts a - w) as a distinct and separate admission.

RESPONSE:

13. Please admit that Defendant submitted a Malfunction Event Reporting Form to the State

related to Opacity Exceedances at the Cherokee Station for the following units on the

following dates:

    a.  December 5, 2007 - Unit 3

    b.  December 22, 2007 - Unit 3

    c.  January 14, 2008 - Unit 3

    d.  March 24, 2008 - Unit 3

    e.  June 23, 2008 - Unit 4

    f.  September 21, 2008 - Unit 4

    g.  April 12, 2009 - Unit 3

    h.  April 27, 2009 - Unit 1

    i.  May 28, 2009 - Unit 4

In responding to this Request, please treat each Malfunction Event Reporting Form delineated above (as subparts a - i) as a distinct and separate admission.

RESPONSE:

14. Please admit that each Malfunction Event Reporting Form and Upset Condition Reporting Form related to Opacity Exceedances at the Cherokee Station on the following dates was signed by Defendant or an official representative of Defendant:

    a.  November 13, 2004

    b.  December 23, 2004

    c.  December 27, 2004

    d.  January 7, 2005

    e.  March 15, 2005

f.   April 10, 2005

g.   July 14, 2005

h.   July 29, 2005

i.   November 7, 2005

j.   November 18, 2005

k.   December 9, 2005

l.   January 7, 2006

m.  June 15, 2006

n.   June 16, 2006

o.   September 13, 2006

p.   December 30, 2006

q.   January 23, 2007

r.   February 2, 2007

s.   April 3, 2007

t.   April 6, 2007

u.   April 27, 2007

v.   June 20, 2007

w.  July 23, 2007

x.   December 5, 2007

y.   December 22, 2007

z.   January 14, 2008

aa. March 24, 2008

bb. June 23, 2008

cc. September 21, 2008

dd. April 12, 2009

ee. April 27, 2009

ff. May 28, 2009

In responding to this Request, please treat each Malfunction Event Reporting Form and
Upset Condition Reporting Form delineated by the above dates (as subparts a - ff) as a
distinct and separate admission.

RESPONSE:


15. Please admit that Defendant is not required to monitor opacity at Units 1-4 of Cherokee
    Station during periods when fuel is not being combusted in the boiler and the fans are not
    still in operation following combustion.

RESPONSE:


16. Please admit that Defendant cannot be in violation of its opacity limits at Units 1-4 of
    Cherokee Station during a period when fuel is not being combusted in the boiler and the
    fans are not still in operation following combustion.

RESPONSE:


17. Please admit that Defendant reported periods of non-operation of Units 1-4 at the
    Cherokee Station to the State of Colorado during the Relevant Period.

RESPONSE:

18. Please admit that you have no evidence indicating that any unit at the Cherokee Station was operating during periods that unit was reported by Defendant to the State as not operating.

RESPONSE:

19. Please admit that each COMS Downtime period within the 2,194 hours of COMS Downtime that you identified in the Complaint during the Relevant Period was reported by Defendant to the State of Colorado.

RESPONSE:

20. Please admit that each Opacity Exceedance you identified in the Complaint during the Relevant Period was reported by Defendant to the State of Colorado.

RESPONSE:

21. Please admit that instances of COMS downtime are authorized under federal and state regulations and the Cherokee Title V permit when they occur during periods of calibration, quality assurance, preventative maintenance, repair, backups of data from the data acquisition and handling system, or recertification.

RESPONSE:

22. Please admit that you do not have any evidence indicating that any specific instance of COMS downtime did not occur within a period of calibration, quality assurance, preventative maintenance, repair, backups of data from the data acquisition and handling system, or recertification.

RESPONSE:

23. Please admit that CDPHE had during the Relevant Period and has the authority to enforce the terms of the Cherokee Station Title V permit

RESPONSE:

24. Please admit that the CDPHE and the State of Colorado have not pursued any administrative or civil enforcement action under any state or federal environmental statute, regulation, or permit against Defendant for Opacity Exceedances at Cherokee Station during the Relevant Period.

RESPONSE:

25. Please admit that the CDPHE and the State of Colorado have not pursued any administrative or civil enforcement action under any state or federal environmental statute, regulation, or permit against Defendant for Opacity Downtime at Cherokee Station during the Relevant Period.

RESPONSE:

26. Please admit that the CDPHE determined that the Cherokee Station's Title V permit was not required to contain a compliance plan to bring the Cherokee Station into compliance with opacity monitoring requirements.  (See February 11, 2010 Letter from Colorado Air Pollution Control Division to Jeremy Nichols, Climate and Energy Program Director, WildEarth Guardians, regarding Response to Comments on Draft Renewal Operating Permit.)

RESPONSE:

27. Please admit that the Colorado Air Pollution Control Division acknowledges that even equipment that is well operated and maintained is likely to experience instances of inoperability that cannot reasonably be anticipated or prevented.  (See February 11, 2010 Letter from Colorado Air Pollution Control Division to Jeremy Nichols, Climate and Energy Program Director, WildEarth Guardians, regarding Response to Comments on Draft Renewal Operating Permit.)

RESPONSE:

28. Please admit that the Colorado Air Pollution Control Division actively review excess emissions reports and makes determinations whether or not the operator is taking reasonable and appropriate response measures under the circumstances to ensure the equipment is operating and functional.  (See February 11, 2010 Letter from Colorado Air Pollution Control Division to Jeremy Nichols, Climate and Energy Program Director, WildEarth Guardians, regarding Response to Comments on Draft Renewal Operating

Permit.)

RESPONSE:

29. Please admit that the Colorado Air Pollution Control Division conducted a case-by-case assessment of the Monitor Downtime at Cherokee Station during the Relevant Period. (See February 11, 2010 Letter from Colorado Air Pollution Control Division to Jeremy Nichols, Climate and Energy Program Director, WildEarth Guardians, regarding Response to Comments on Draft Renewal Operating Permit.)

RESPONSE:

30. Please admit that the Colorado Air Pollution Control Division concluded that the Monitor Downtime at Cherokee Station during the Relevant Period does not reflect an enforceable failure to continuously monitor opacity. (See February 11, 2010 Letter from Colorado Air Pollution Control Division to Jeremy Nichols, Climate and Energy Program Director, WildEarth Guardians, regarding Response to Comments on Draft Renewal Operating Permit.)

RESPONSE:

31. Please admit that Defendant replaced the COMS monitors at Units 1-4 at the Cherokee Station during 2008.

RESPONSE:

32. Please admit that the replacement of the COMS monitors at Units 1-4 at the Cherokee Station during 2008 was undertaken voluntarily (*i.e.*, was not required by statute, regulation or order) by Defendant.

RESPONSE:


33. Please admit that Defendant notified the State of each COMS monitor replacement at Units 1-4 at the Cherokee Station that took place during 2008.

RESPONSE:


34. Please admit that the State of Colorado certified each COMS monitor replacement at Units 1-4 at the Cherokee Station that took place during 2008.

RESPONSE:


35. Please admit that Teledyne-Monitor Labs/USI certified its Model 550 opacity monitors as in compliance with 40 C.F.R. Part 60, Appendix B, Performance Specification 1 at the time of their installation on Units 1-4 at the Cherokee Station.

RESPONSE:


36. Please admit that Teledyne-Monitor Labs/USI certified its Model 560 opacity monitors as in compliance with 40 C.F.R. Part 60, Appendix B, Performance Specification 1 at the time of their installation on Units 1-4 at the Cherokee Station.

RESPONSE:

37. Please admit that every COMS has failures that cannot be reasonably anticipated or prevented.

RESPONSE:


38. Please admit that Defendant uses fabric filter dust collection systems (or baghouses) to control particular matter from Units 1, 2, 3 and 4 at Cherokee Station.

RESPONSE:


39. Please admit that Defendant has welded shut the baghouse bypass (also called the "baghouse bypass poppets" the "bypass poppets" or the "bypass poppits") at each of the four units at the Cherokee Station.

RESPONSE:


40. Please admit that Defendant operated Cherokee Station pursuant to a validly-issued Title V operating permit during the Relevant Period.

RESPONSE:


41. Please admit that Defendants currently hold a valid Title V permit for the Cherokee Station.

RESPONSE:

42. Please admit that Defendant is require to perform a calibration on each COMS at Units 1-
4 at Cherokee Station at least once per day.

RESPONSE:


43. Please admit that a calibration of the COMS results in COMS Downtime.

RESPONSE:


44. Please admit that every document produced by you in this litigation bearing the bates
stamp number prefix "WEG" is authentic and a true and accurate copy.

RESPONSE:


45. Please admit that you have no evidence that Defendant derived any economic benefit
from instances of alleged COMS downtime during the Relevant Period.

RESPONSE:


46. Please admit that you have no evidence that Defendant derived any economic benefit
from opacity exceedances at the Cherokee station during the Relevant Period.

RESPONSE:


47. Please admit that the relationship between opacity and particulate matter concentration is
highly variable.

RESPONSE:

48. Please admit that specific particulate matter emissions cannot be determined from a given
level of opacity or from an increase in opacity.

RESPONSE:


49. Please admit that opacity is an imperfect surrogate for assessing mass emissions.

RESPONSE:


50. Please admit that opacity measurements cannot be used to determine whether a
particulate matter emission limit is being exceeded.

RESPONSE:


51. Please admit that the particulate matter emission limit for each of Units 1-4 in the
Cherokee Station Title V permit during the Relevant Period was 0.1 pounds per million
BTU.

RESPONSE:


52. Please admit that Defendant did not exceed the particulate matter emission limits for
Units 1-4 in the Cherokee Station Title V permit during the Relevant Period.

RESPONSE:


53. Please admit that Defendant did not report any exceedances of the particulate matter

emission limits for Units 1-4 in the Cherokee Station Title V permit during the Relevant

Period.

RESPONSE:

54. Please admit that you have no evidence that Defendant exceeded the particulate matter

emission limits for Units 1-4 in the Cherokee Station Title V permit during the Relevant

Period.

RESPONSE:

55. Please admit that the COMS were operable and producing valid data in excess of 98% of

the operating time for Units 1-4 at the Cherokee Station during the Relevant Period.

RESPONSE:

56. Please admit that WildEarth Guardians member Tom Anthony is not a realtor, appraiser,

broker, or other real estate professional.

RESPONSE:

57. Please admit that WildEarth Guardians member Tom Anthony is not a medical

professional.

RESPONSE:

58. Please admit that WildEarth Guardians member Tom Anthony is not a biologist,

ecologist, chemist, or fisheries scientist.

RESPONSE:

59. Please admit that WildEarth Guardians member Tom Anthony is not trained or certified in measuring opacity in any way.

RESPONSE:

60. Please admit that WildEarth Guardians member Tom Anthony has no evidence that his son's sensitivity has been caused by emissions from the Cherokee Station.

RESPONSE:

61. Please admit that WildEarth Guardians member Emily Taylor is not a medical professional.

RESPONSE:

62. Please admit that WildEarth Guardians member Emily Taylor is not a scientist.

RESPONSE:

63. Please admit that WildEarth Guardians member Emily Taylor has no evidence that emissions from the Cherokee Station has caused asthma in her students.

RESPONSE:

64. Please admit that WildEarth Guardians member Emily Taylor has no evidence that emissions from the Cherokee Station cause wheezing in her students or other children.

RESPONSE:

65. Please admit that WildEarth Guardians member Emily Taylor has no personal knowledge of whether the particulate matter she has seen precipitating on the ground is from Cherokee.

RESPONSE:

66. Please admit that WildEarth Guardians member Emily Taylor is not trained or certified in measuring opacity in any way.

RESPONSE:

67. Please admit that WildEarth Guardians member Eric Bonds is not a medical professional.

RESPONSE:

68. Please admit that WildEarth Guardians member Eric Bonds has no evidence that emissions from the Cherokee Station intensify his asthma.

RESPONSE:

69. Please admit that WildEarth Guardians member Eric Bonds is not trained or certified in measuring opacity in any way.

RESPONSE:

70. Please admit that Jeremy Nichols, Director of the Climate and Energy Program at WildEarth Guardians, is not a medical professional.

RESPONSE:

71. Please admit that Jeremy Nichols, Director of the Climate and Energy Program at WildEarth Guardians, is a not an expert in biology, chemistry or health sciences.

RESPONSE:

72. Please admit that Jeremy Nichols, Director of the Climate and Energy Program at WildEarth Guardians, is not in any way trained or certified to measure opacity.

RESPONSE:

73. Please admit that Jeremy Nichols, Director of the Climate and Energy Program at WildEarth Guardians, is not an expert in opacity emissions or COMS.

RESPONSE:

74. Please admit that Jeremy Nichols, Director of the Climate and Energy Program at WildEarth Guardians, is not an expert on coal-fired power plants or emissions from coal-fired power plants.

RESPONSE:

75. Please admit that Jeremy Nichols, Director of the Climate and Energy Program at WildEarth Guardians, is not an expert on air quality.

RESPONSE:


76. Please admit that John Horning, Executive Director of WildEarth Guardians, is a not medical professional.

RESPONSE:


77. Please admit that John Horning, Executive Director of WildEarth Guardians, is a not scientist.

RESPONSE:


78. Please admit that John Horning, Executive Director of WildEarth Guardians, is not in any way trained or certified to measure opacity.

RESPONSE:


79. Please admit that John Horning, Executive Director of WildEarth Guardians, is not an expert in opacity emissions or COMS.

RESPONSE:


80. Please admit that John Horning, Executive Director of WildEarth Guardians, is not an

expert on coal-fired power plants or emissions from coal-fired power plants.

RESPONSE:


81. Please admit that John Horning, Executive Director of WildEarth Guardians, is not an

expert on air quality.

RESPONSE:

### DEFENDANT'S SECOND SET OF INTERROGATORIES TO PLAINTIFF

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Public Service Company of Colorado d/b/a Xcel Energy ("PSCo"), by and through its counsel, hereby submits its Second Set of Interrogatories to Plaintiff, WildEarth Guardians.  Plaintiff is required to answer the Interrogatory set forth below under oath within thirty (30) days from the date of service.

### INSTRUCTIONS

A.    If you cannot respond to or comply with an Interrogatory in full, you shall respond or comply with the Interrogatory to the extent possible with an explanation as to why a full response or full compliance is not possible.

B.    Each paragraph and subparagraph of an Interrogatory shall be construed independently and no other paragraph or subparagraph shall be referred to or relied on for the purpose of limiting its scope.

C.    In answering these Interrogatories, Plaintiff is required to furnish under oath all information that is available to Plaintiff, including information in the possession of Plaintiff's attorneys or other persons directly or indirectly employed by or in connection with Plaintiff or Plaintiff's attorneys or anyone acting on Plaintiff's behalf or otherwise subject to Plaintiff's control.

D.    If in answering these Interrogatories Plaintiff claims any ambiguity in interpreting either an Interrogatory or a definition or instruction applicable thereto, such claim shall not be used by Plaintiff as a basis for refusing to respond.  Rather, Plaintiff shall set forth, as part of its response, the language, instruction or definition deemed to be ambiguous and the

interpretation chosen or used by Plaintiff in responding to the Interrogatory.

E.     If Plaintiff claims that an Interrogatory or any portion thereof seeks information subject to a legally cognizable privilege, you shall identify the Interrogatory or portion thereof to which you are objecting on the grounds of privilege and you shall state in detail the privilege(s) asserted and the bases for each assertion of privilege.  Nonetheless, Plaintiff shall respond to such Interrogatory to the extent that it also seeks non-privileged information.

F.     Estimates or approximations should be given when precise data cannot be supplied.  However, any estimates or approximations should be designated as such and a statement made as to why precise data cannot be supplied.

G.     The source, sources or derivation of each answer to the Interrogatories should be separately set forth and identified, unless the person signing the answers to these Interrogatories under oath knows of his own person and direct knowledge of the facts or information forming the basis of all answers given.

H.     These Interrogatories are continuing in nature.  If additional information or documents become known regarding any of these Interrogatories, you are to furnish a supplemental response when such information or documents becomes available.

I.     For the purposes of these Interrogatories, the singular shall be construed to include the plural, and the plural shall be construed to include the singular.  The words "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the specific request all documents that might otherwise be construed to be outside of its scope.  The words "all" and "each" shall be construed as all and each.

## INTERROGATORIES

**INTERROGATORY NO. 14:**

For each of the Requests for Admission contained in Defendant's First Requests for Admission that Plaintiff fails to admit in its entirety and without limitation, please identify the factual basis for that failure to admit, in whole or in part, or for any limitation on such admissions.

**RESPONSE:**

Respectfully submitted this 29th day of September, 2010.

s/ Kent Mayo
William Bumpers
Kent Mayo
BAKER BOTTS LLP
1299 Pennsylvania Ave, N.W.
Washington, DC  20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
william.bumpers@bakerbotts.com
kent.mayo@bakerbotts.com

s/ Colin C. Deihl
Colin C. Deihl, #19737
Linda L. Rockwood, #14276
Jacy T. Rock, #36717
FAEGRE & BENSON LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
Telephone: (303) 607-3500
Facsimile: (303) 320-0210
cdeihl@faegre.com
lrockwood@faegre.com
jrock@faegre.com

**Counsel for Defendant Public Service
Company of Colorado**

## CERTIFICATE OF SERVICE

I certify that on this 29th day of September, 2010, a true and correct copy of the foregoing DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION AND SECOND SET OF INTERROGATORIES TO PLAINTIFF was served by electronic mail and first-class mail on:

Michael Ray Harris
Kevin J. Lynch
Assistant Professor & Director
Environmental Law Clinic
University of Denver
Sturm College of Law
2255 E. Evans Ave.
Denver, Colorado 80308
mharris@law.du.edu
klynch@law.du.edu

Lino S. Lipinsky de Orlov
Herbert L. Fenster
McKenna Long & Aldridge LLP
1400 Wewatta Street, Suite 700
Denver, CO 80202
Telephone: 303-634-4000
Facsimile: 303-634-4400
llipinsky@mckennalong.com
hfenster@mckennalong.com

*s/ Kent Mayo*