IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson


Civil Action No.  09-cv-01862-MEH-RBJ

WILDEARTH GUARDIANS,

      Plaintiff,

v.

PUBLIC SERVICE COMPANY OF COLORADO
d/b/a XCEL ENERGY,

      Defendant.

---

## ORDER ON PENDING MOTIONS

---

      Four motions, two to limit or exclude expert testimony, and two for summary judgment or partial summary judgment, are presently pending before the Court and are resolved by this order.

### Background

      Defendant owns and operates a coal-fired power plant known as the Cherokee Station in Adams County, Colorado.  The plant's four electric generating units emit particulates and other pollutants into the air through exhaust stacks.  Plaintiff, an environmental organization, contends that defendant violated federal and state environmental requirements applicable to the four units during a five-year period, August 6, 2004 to August 6, 2009.  More specifically, this case involves monitoring and control of stack emissions through "opacity" standards.  Opacity refers to the degree to which light can be transmitted through exhaust gases.  Measurement of opacity,

1

which is done by shining a light through the emissions, serves as a surrogate test for pollutants including particulates.

Regulation of air quality is a complicated federal and state process.  Congress in the Clean Air Act directed the United States Environmental Protection Agency ("EPA") to establish "national ambient air quality standards" for certain pollutants.  42 U.S.C. § 7409.  In 1990 the Act was amended by, among other things, the addition of Title IV, 42 U.S.C. §7651 et seq.  As relevant to the present case, Title IV and federal regulations thereunder require that power plants install continuous opacity monitoring systems ("COMS") in each stack, and that the COMS operate at all times when the plant is combusting fuel or the fans are operating following combustion, with certain exceptions.  The exceptions, set forth at 40 C.F.R. § 75.10(d), include periods of calibration, quality assurance, preventative maintenance, repair, backups of data, and recertification.

Each state has a State Implementation Plan ("SIP") approved by the EPA that is designed to ensure that the State's air meets the laws' requirements.  Regulations issued pursuant to Colorado's SIP require that defendant's COMS operate continuously except for system breakdowns, repairs, calibration checks and certain adjustments.

In an apparent effort to simplify the complicated collection of federal and state statutory and regulatory requirements, Congress in 1990 enacted Title V of the Clean Air Act, 42 U.S.C. § 7661 et seq.  This established an operating permit program to be administered by the states under the supervision of the EPA.  An operating permit does not add substantive environmental requirements.  Rather, it consolidates applicable federal and state clean air requirements into a single document.  *See Sierra Club v. Georgia Power Co.,* 443 F. 3d 1346, 1348 (11th Cir. 2006).  It must comply with the State's SIP.  *Id.* at 1349.

The Cherokee Station's Title V operating permit was issued in 2002 by the Air Pollution Control Division of the Colorado Department of Public Health and Environment.  Accordingly, the claims in the present case focus on the requirements of defendant's operating permit, which in turn reflect the requirements of the Clean Air Act, federal regulations, and the Colorado SIP.

In its first claim, plaintiff alleges that defendant failed to comply with requirements for the continuous monitoring of the opacity of the emissions from the stacks at the plant's four operating units set forth in the permit at § 10.2.1.  Defendant reported 2,194 hours of downtime for its COMS during the five year period in question.  Plaintiff alleges that, for the most part, the downtime did not fall within one of the exceptions because it included "repeated monitor equipment and communication failures" resulting from "similar, foreseeable malfunction events."  Complaint, ¶61.

In its Second Claim, plaintiff asserts that defendant's emissions exceeded opacity limitations contained in the permit.  The opacity of the plant's emissions, measured in percentage terms, is limited by the permit to 20% except for limited periods (building a new fire, cleaning fire boxes, soot blowing, start-up, process modification or adjustment, cleaning control equipment) when 30% opacity is permitted.  There were 49 occasions during the five-year period where the limits were exceeded and, plaintiff alleges, possibly other violations that cannot be known during periods when the COMS were down.  Plaintiff alleges that these permit violations are likely to continue.

Finally, in its Third Claim, plaintiff alleges that defendant failed accurately to report downtime violations and to certify the accuracy and completeness of certain deviation reports in violation of its permit and the substantive environmental laws.  Plaintiff alleges that these violations too are likely to continue.

Plaintiff prays for declaratory and injunctive relief, substantial civil (monetary) penalties, costs and attorney's fees.

With that background, the Court addresses the four pending motions:

**Plaintiff's Motion to Exclude Expert Testimony [docket #177].**

Plaintiff asks the Court to exclude sections IX through XII of the expert report of Richard D. McRanie and to preclude him from testifying at trial on the subjects covered in those sections. He has also written a rebuttal report to the report of plaintiff's expert, Dr. Sahu, that is not the subject of this motion.

It is important first to recognize that there are two basic issues in this case as in any case: liability and remedy. The liability issue is whether violations of the permit occurred. The remedy issue can be divided into two parts. First, the Court will declare that violations have occurred, if they have, and will enjoin future violations. Second, and more difficult, will be a determination whether and to what extent civil penalties are appropriate.

It is also important to remember that this will be a bench trial. Because of the pending motions, I am now familiar with the entirety of the McRanie and Sahu reports. However, the Court will disregard the irrelevant or otherwise inadmissible opinions.

The overall gist of Mr. McRanie's original report is that monitoring equipment failures are inevitable and essentially unavoidable in an electric generating plant, and that given that practical reality, defendant has done an excellent job at the Cherokee Station. Those opinions are not relevant to the liability issue. However, they may well be helpful in determining equitable remedies and sanctions.

Section IX of Mr. McRanie includes a complex discussion of what he considers to be relevant regulations and his interpretation of them. However, simply put, an expert may not tell

the Court what the law is.  Counsel can present argument as to how the terms of the permit should be interpreted.  But an expert will not be allowed to tell the Court how he thinks the Clean Air Act, the regulations, or the Colorado SIP should be interpreted.  That is not to say that Mr. McRanie's opinions are necessarily wrong.  I recognize that he has substantial experience and expertise.  However, interpretation of the law is a matter for the Court.  The opinions expressed in Section IX are largely if not entirely inadmissible.  For the same reason Mr. McRanie's opinions in section X of his original report concerning interpretation of the permit are not admissible.

Section XI contains some of the same type of inadmissible expert opinion testimony on what the permit requires or does not require.  However, it also includes opinions that generally go to the predictability and avoidability of the monitoring downtime incidents and to defendant's equipment upgrades during the relevant time period, all of which are potentially relevant to the questions of remedy and sanctions. and all of which are subjects on which plaintiff's expert, Dr. Sahu, has also expressed opinions.  The fact that Mr. McRanie did not conduct an incident by incident analysis of the failures but instead relied on defendant's reports goes to the weight but not the admissibility of the opinion.

Section XII of the report discusses what Mr. McRanie calls "opacity excursions," which I take to mean violations of the 20% or 30% opacity limits, and his opinion regarding the overall excellence of defendant's response to these incidents and defendant's performance generally. Those opinions are relevant to remedy issues.

In summary, the motion is GRANTED as to the types of opinions characteristic of sections IX and X of the report but DENIED as to the types of opinions characteristic of sections XI and XII of the report.  This is not a ruling on whether any part of the report itself would be

5

admitted into evidence or on how the Court will ruling on specific questions at trial.  The Court's intent is to give counsel guidance on what testimony is likely to be admitted and what is likely to be excluded.

**Defendant Public Service Company of Colorado's Motion to Exclude Certain Expert Testimony of Dr. Ranajit Sahu [#178].**

Defendant contends that Dr. Sahu's methods and therefore his opinions concerning monitoring and reporting are unreliable and should be entirely excluded under Fed. R. Evid. 702. Neither party has requested an evidentiary hearing or oral argument on this motion.  Without a request, the Court may consider the motion on the briefs.  *See U.S. v. Nacchio,* 555 F.3d 1234, 1251 (10th Cir. 2009).

Expert opinion testimony is admissible if it is relevant and reliable.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 594-95 (1993).  The opinions are relevant if they would "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  They are reliable if (1) the expert is qualified "by knowledge, skill, experience, training, or education," (2) his opinions are "based upon sufficient facts or data," and (3) they are "the product of reliable principles and methods."  *Ibid.*

The proponent of expert testimony has the burden to show that the testimony is admissible.  *U.S. v. Nacchio,* 555 F. 3d at 1241.  The trial court plays a "gatekeeping" role.  This is not, however, a role that emphasizes exclusion of expert testimony.  Judge Kane aptly summarized the thrust of *Daubert* in interpreting and applying Rule 702:

> A key but sometimes forgotten principle of Rule 702 and *Daubert* is that Rule 702, both before and after *Daubert,* was intended to relax traditional barriers to admission of expert opinion testimony.  Accordingly, courts are in agreement that Rule 702 mandates a liberal standard for the admissibility of expert testimony.  As the Advisory Committee to the 2000 amendments to Rule 702 noted with

apparent approval, "[a] review of the caselaw after *Daubert* show that the
rejection of expert testimony is the exception rather than the rule.

*Cook v. Rockwell Intern. Corp.,* 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citations omitted).

Like Mr. McRanie, Dr. Sahu did not perform an incident by incident analysis of the
causes of COMS downtime. However, he examines a number of the incidents, based upon
defendant's deviation reports, and expresses opinions regarding predictability and avoidability.

The same evidentiary rules will, of course, be applied to both sides' experts. However,
based on my review of Dr. Sahu's report, I do not find that he has expressed opinions that are
likely to be excluded. His opinions are relevant both to liability and to remedy. He is well
qualified to express opinions in this area. Defendant argues that these opinions are "so
untethered to the specific facts of individual downtime events that it provides no assistance to the
Court in assessing whether Plaintiff can demonstrate that each of the identified downtime events
constitutes a violation." Motion at 8-9. I disagree and find that, to some extent, this is like the
stork's calling the great blue heron stilted. Based on the reports, Dr. Sahu's opinions are as
grounded in the facts as those of Mr. McRanie. Finally, I find nothing in his report or in
defendant's briefs that suggests that Dr. Sahu's opinions are not the product of reliable principles
and methods. Accordingly, the motion is DENIED.

**Plaintiff's Partial Motions for Summary Judgment [#193].**

Summary judgment may be granted if the moving party shows that there is no genuine
issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.
Civ. P. 56(a). Plaintiff identifies nine issues on which it claims there are no genuinely disputed

issues of fact.  Defendant claims that there are genuinely disputed issues of fact precluding summary disposition on all nine issues.[1]

The Court finds that there are disputed issues of fact inherent in what plaintiff labels as motions for summary judgment numbers one through six, eight and nine.  These issues all involve whether defendant's alleged violations of the permit fit within an exception allowed by the permit.  However, the Court suggests that defendant take another hard look at the alleged violations.  I expect that defendant's technical people know whether a violation has occurred.  Defendant will do much to enhance its credibility with the Court if it candidly admits violations that should be admitted.

Plaintiff's seventh "motion" raises a purely legal issue, i.e., whether the use of backup monitoring as described in permit condition 10.4.3 excuses violations of the continuous opacity monitoring requirement.  The answer is "no."  Section 10.2.1 of the permit requires that COMS be in operation and monitoring opacity "at all times" when the boiler is combusting fuel and following combustion when fans are still operating with specified exceptions.  This is consistent with 40 C.F.R. § 75.10(d).  Section 10.4.3 provides that when a COMS is unable to provide quality assured date for more than eight consecutive hours, the defendant may elect to use one of three types of alternate measuring systems to satisfy the requirements of 40 C.F.R. Part 70 and Colorado Regulation No. 3.  Section 10.4.3 does not provide that the use of the alternate methods is another exception or excuse for violations of section 10.2.1.  The Court will not interpret the permit in a manner that would be inconsistent with 40 C.F.R. § 75.10(d).

To any extent that Judge Weinshienk's order on defendant's motion to dismiss can be read as indicating otherwise, the order is now clarified.  The use of one of the alternate methods

---

[1] I note that it took 96 pages of briefs and 54 exhibits containing 2926 pages of documents for the two parties to present their arguments.  This by itself has some tendency to suggest that there must be issues of material fact in dispute.

is part of the overall picture when it comes to determining a remedy or sanction for violation of section 10.2.1, but it does not mean that a violation did not occur.  To the extent that defendant's defenses argue otherwise, they are rejected by the Court as a matter of law.

In summary, plaintiff's motion is GRANTED to the extent of the Court's interpretation of condition 10.4.3 of the permit but is otherwise DENIED.

**Defendant Public Service Company of Colorado's Motion for Summary Judgment [#196].**

Defendant moves for summary judgment dismissing plaintiff's claims and case in their entirety.[2]  I will bypass the introductory discuss of plaintiff's alleged motives and defendant's overall successful compliance which are irrelevant to the summary judgment issue.  Defendant's argument is organized in five parts.

Notice.

First, defendant argues that plaintiff's third claim, asserting reporting violations, is barred by lack of notice.  The Clean Air Act provides that a citizen suit may not be commenced against an alleged violator prior to 60 days after the plaintiff has given notice to the EPA, the State and the violator of the standard, limitation or order alleged to have been violated.  42 U.S.C. § 7604(b)(1).  40 C.F.R. § 54.3 requires that the notice "shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order which has allegedly been violated, the activity alleged to be in violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name and address of the person giving the notice."

---

[2] As with plaintiff's motion, the sheer presentations of the parties tend to raise questions about the viability of summary disposition.  Between them they filed 104 pages of briefs supported by 64 exhibits containing 3596 pages of documents on this motion.

The permit requires that defendant file (1) a Monitoring Deviation Report every six months which identifies all deviations from the plant's monitoring requirements.  App. B at 1; (2) a Permit Deviation Report "promptly" after any deviation from a permit requirement.  App. B at 1-2.; (3) an Annual Compliance Certification.  App. B. at 2-3; and (4) Quarterly Excess Emission Reports, which identify, among other things, the nature, cause, date, and time of excess emissions or monitor downtime.  Permit § II, Condition 10.5.

In its Complaint plaintiff alleges that defendant failed accurately to report downtime violations in its deviation reports and annual compliance reports during the five-year period in question (¶70), and that it failed to certify the accuracy and completeness of its reports during that period (¶71).

Plaintiff's notification letters, dated January 28, 2008 (by plaintiff's predecessor) and April 1, 2009, are included in Exhibit A to the Complaint.  The January 28, 2008 letter notifies defendant of two violations: (1) opacity limitations and violations, and (2) downtime limitations and violations.  *Id.* at 4-5.  No reporting violation is separately identified.  Giving plaintiff the benefit of the doubt, however, the letter states that "RMCAA intends to sue Xcel for failure to comply with certification compliance requirements under Cherokee's Title V Permit." *Id.* at 2. In apparent explanation of that statement, the letter notes that defendants EERs listed the exact dates and times of all opacity violations, totaling 538 reported violations, but only 126 of those violations were labeled as violations of the opacity limit; the other 412 violations were reported as downtime violations.  *Id.* at 4-5.  Thus, the EERs and deviation reports, which must be certified as true, accurate and complete, were not accurate and complete and "breached this requirement" of the permit.  The April 1, 2009 letter adds nothing with respect to reporting.

In response to the motion for summary judgment with respect to the Third Claim for Relief (the reporting claim), plaintiff argues that it has come forward with evidence of (1) 44 opacity exceedances that were not reported in the EERs; (2) Semi-Annual Reports that excluded monitor downtime exceeding eight hours; (3) EERs and Semi-Annual Reports that excluded excessive and unnecessary period of calibration; (4) misleading reporting of opacity readings above 20%; and (5) monitor downtime that was not reported.  Response at 8-9.  With the possible exception of the fourth item, the notice letters said nothing about these other alleged reporting errors.  However, plaintiff's counsel has clarified that plaintiff is not pursuing a reporting claim based upon the mislabeling issue.  Docket #196-21 (Ex. U to Motion for Summary Judgment).

The Court finds that plaintiff did not give adequate notice, indeed any notice, of the reporting violations on which it bases its Third Claim for Relief.  Therefore, the Court grants the motion for summary judgment to the extent that plaintiff's Third Claim for Relief is dismissed.

Standing

Defendant argues that plaintiff does not have standing to maintain its claim of opacity violations.  I disagree and conclude that this issue was resolved against the defendant in Judge Weinshienk's order of April 15, 2010, with which I agree.

Monitor Downtime Claims (First Claim for Relief), and
Opacity Limit Violations (Second Claim for Relief)

For reasons discussed with respect to plaintiff's motion for partial summary judgment, the Court finds that there are fact disputes concerning alleged opacity limit violations that preclude summary judgment.  The Court also finds that there are fact disputes concerning alleged monitor downtime disputes that preclude summary judgment.

<u>Reporting Violations</u> (Third Claim for Relief)

As indicated, the Court has granted summary judgment dismissing the Third Claim for Relief for failure to comply with the notice requirements of the Clean Air Act and the related federal regulation.  Therefore, the defendant's arguments in the fifth and final section of its motion are moot.

**Order**

1. Motion #177 is GRANTED as to the opinions expressed in Sections IX and X of the McRanie report, and in general as to expression of opinions as to what the laws is, but is otherwise DENIED.  The Court will consider any other evidentiary issues that might affect Mr. McRanie's testimony at the time of trial.

2. Motion # 178 is DENIED.  The Court will consider other evidentiary issues that might affect Dr. Sahu's testimony at the time of trial.

3. Motion #193 is GRANTED to the extent that the Court holds as a matter of law that compliance with permit section 10.4.3 does not excuse violations of the permit's continuous monitoring requirements but is otherwise DENIED.

4. Motion #196 is GRANTED to the extent that plaintiff's Third Claim for Relief is dismissed as a matter of law but is otherwise DENIED.

The Court requests that counsel contact the Court's Judicial Assistant at 303-844-4694 to set a five-day bench trial.  If counsel cannot agree on a trial date within 2012, preferably within the first six months of 2012, the Judicial Assistant will arrange a conference call with the Court to set a date.  Because there are multiple lawyers and law students involved, I ask that you be flexible, since it may be difficult to find a date that is perfect for everyone.

The Court is not inclined to believe that a "bellwether" structure or other unusual trial structure is necessary.  As I have indicated, my impression is that whether violations have occurred ideally should be something as to which the parties could stipulate.  If that is not possible, and if the parties continue to believe that an unusual trial structure is appropriate, please set a hearing.  The Court is always willing to consider creative procedures during the course of a trial such as periodic mini openings or closings as the trial proceeds.

DATED this 3rd day January, 2012.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge