**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 09-CV-01862-RBJ-MEH

WILDEARTH GUARDIANS,
   Plaintiff,

v.

PUBLIC SERVICE COMPANY OF COLORADO d/b/a XCEL ENERGY,
   Defendant.

**PLAINTIFF'S THRESHOLD LEGAL ISSUES OPENING BRIEF**

**INTRODUCTION**

In order to streamline the trial of this case, WildEarth Guardians ("Guardians") requests the Court rule on eight threshold legal issues and on Defendant's renewed insufficient notice claim.[1]

The Court should rule as follows:

**#1** The exceptions to the Clean Air Act's ("CAA") continuous monitoring requirement will be interpreted narrowly[2]:

   **a.** The **repair exception** applies only to the time when actions are taken to fix an unforeseeable, sudden and unavoidable breakdown of the opacity monitor or the automated data acquisition and handling system ("DAHS").

   **b.** The **calibration exception** applies only to (1) necessary and regularly scheduled calibrations as required by 40 C.F.R. § 60.13(d) and (2) calibrations when the continuous opacity monitoring system ("COMS") comes back online and starts providing valid data following a legitimate monitor downtime.

---

[1] The number and nature of the individual claims and defenses in this case present complications for both parties in developing efficient trial presentations. At issue are 15,749 violations of continuous opacity monitoring and 159 violations of opacity exceedences at Xcel's Cherokee Station in Denver, Colorado.

[2] Ruling on the exception definitions will apply to periods of monitor downtime as follows: repair – 9,334 periods; calibration – 2,902 periods; quality assurance – 2,198 periods; preventative maintenance – 178 periods.

1

    **c.** The **quality assurance exception** applies only to systematic planned activities, other than calibration or preventative maintenance, that require the COMS to be down to make the monitor or the monitor data more accurate or reliable.

**#2** Xcel bears the burden of establishing the applicability of continuous monitoring exceptions.

**#3** Xcel may not rely on the upset exemption for any opacity violations and may rely on the malfunction affirmative defense only for opacity violations occurring after October 6, 2008.

**#4** Xcel's failure to timely report opacity violations to the State precludes its reliance on the upset exemption or the malfunction affirmative defense.

**#5** Xcel bears the burden of establishing the applicability of the upset exemption or the malfunction affirmative defense to specific alleged opacity violations.

**#6** Violations of Condition 11.2 are measured in sixty-minute increments.

**#7** Xcel bears the burden of establishing the applicability of an increased opacity limit under Condition 11.2.

**#8** Opacity limits are applicable when the unit is offline.

**Notice**: Guardians gave sufficient notice for claims of monitor downtime.

## ARGUMENT

### A. ISSUES RELATED TO OPACITY MONITORING CLAIMS

#### #1. The Court Should Narrowly Define Exceptions to the Continuous Monitoring Requirement.

    The CAA requires "continuous" emissions monitoring. *See* 42 U.S.C. § 7651k(a); 42 U.S.C. § 7651a(7). EPA created exceptions to the monitoring requirement for periods of repair, calibration, quality assurance, preventative maintenance, data backup and recertification.[3] 40 C.F.R. § 75.10(d). As an initial matter, it is not clear that creating exceptions to the monitoring requirement is a reasonable interpretation of the CAA because the statute unequivocally requires

---

[3] Xcel did not claim the preventative maintenance, data backup or recertification exceptions for a large number of monitor downtime. Guardians will address these exceptions at trial.

*continuous* opacity monitoring. 42 U.S.C. § 7651k(a).[4]

Assuming that EPA's interpretation of the CAA that allows for creation of the exceptions is reasonable, the exceptions must be interpreted narrowly in order to maintain consistency with the language of the CAA. An agency's interpretation of its own regulations must be consistent with the statute at issue. *See Auer v. Robbins*, 519 U.S. 452, 463 (1997). Because EPA has not provided definitions of the exceptions, we must turn to the court for guidance.[5]

Prior to Guardians filing this lawsuit, Xcel did not categorize exceptions according to the language in § 75.10(d).[6] Pl.'s Part. Mot. Summ. J. ("Pl.'s MSJ") Ex. 2, at 12-13 (ECF No. 193-4). After the suit was filed, Xcel retroactively applied § 75.10(d) exception language to every single one of the 15,749 monitor downtime events at issue in this case. *Id.* Xcel's interpretation and application of the exceptions to every monitor downtime event is overly broad. The Court should adopt Guardians' narrow interpretations of the exceptions in order to maintain consistency with the language and purpose of the CAA's continuous monitoring requirement.

### *a. Repair*

Xcel applies an overly inclusive definition of "period of repair" which includes everything "from the time the COMS fails to collect, record, or store valid opacity monitoring data until the time that all repairs . . . have been completed and the COMS can be returned to service," applies to foreseeable, gradual, or avoidable problems with the COMS, and extends to equipment beyond the COMS. Pl.'s MSJ Ex. 4, at 10-11 (ECF No. 193-4).

---

[4] Under the Supreme Court's *Chevron* doctrine, if Congress has directly and unambiguously spoken to the precise question at issue, there is not room for further administrative interpretation or action. *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984).
[5] *See* 58 Fed. Reg. 3590-01 (Jan. 11, 1993) (failing to include definitions of the exceptions when the regulation was published); US EPA, Clean Market Division, Plain English Guide to the Part 75 Rules (Sept. 2005) (failing to define the exceptions), www.epa.gov/airmarkets/emissions/docs/plain_english_guide_part75_rule.pdf.
[6] Instead of identifying downtime according to the exception categories in 40 C.F.R. § 75.10(d), Xcel designated monitor downtime as "monitor equipment failure," "non monitor failures," "calibration (QA)," "unknown causes," and "others" in its reports to the State. For example, *see* Pl.'s MSJ Ex. 17 (ECF No. 193-17).

If the Court adopts Xcel's definition, repair would include not only diagnosis and actual repair time, but also time when Xcel has not noticed the COMS is down and time when Xcel knows the COMS is down but takes no action to correct the problem.[7] However, the plain meaning of repair implies **action**.[8] Therefore, the repair exception should apply only to the period of time when active steps are taken to fix a breakdown. This includes the action of diagnosing the breakdown and, for example, the action of walking to the storeroom for a part. It does not include time after the breakdown when no action has been taken to make a repair, nor periods where no action is taken and the COMS comes back online on its own.[9]

Additionally, Xcel argues that the repair exception applies to downtime stemming from "**any** equipment, mechanical, electrical, system, or process failure that has an impact on the ability of the COMS or DAHS to collect, record, or store valid opacity monitoring data." *Id*. at 10 (emphasis added). There are two problems with this assertion. First, under this definition the repair exception would apply to events that are foreseeable, gradual, or avoidable. As a policy concern, Xcel would have no incentive to develop and implement operating and maintenance policies designed to avoid recurring foreseeable, gradual and avoidable downtime events.[10]

The system breakdown exception at issue *In re Clark Refining and Marketing Corp.* provides additional guidance for a narrow interpretation of the repair exception. No. CAA-05-93, 1995 WL 1052253 *1, 7 (E.P.A. Mar. 9, 1995) (holding that a system breakdown exception to the

---

[7] For example, on April 27, 2005 at 9:36 p.m. the COMS system went down because of "high dirt comp." Pl.'s MSJ Ex. 9, at 21 (ECF 193-9). This means that the lens on the monitor got dirty. The technicians turned off the alarm indicating that the COMS was down and no one took steps to clean the lens until 9:00 the next morning. Ex. 3 at 10-12. Under Xcel's definition, all eleven hours of this monitor downtime are covered under the repair exception. For similar examples, *see* Pl.'s MSJ, at 23-24 (ECF No. 193).

[8] Merriam-Webster defines "repair" as "to restore by replacing a part or putting together what is torn or broken; fix." Merriam Webster Dictionary, http://www.merriam-webster.com/dictionary/repair.

[9] Xcel designated 259 downtime periods as "repair" with the description "downtime resolved on its own."

[10] For example, an operating requirement to clean the COMS lens more frequently to prevent repeated downtime caused by dirt build up.

continuous monitoring requirement for a petroleum refinery "requires there be an occurrence which is unforeseen, sudden and unavoidable"); *see also* Pl.'s MSJ, at 24-26 (ECF No. 193). A "system breakdown" exception is analogous to a "repair" exception because a repair is only necessary as a result of a COMS system breakdown.

Second, Xcel's definition asserts that the repair exception extends to equipment that is **outside** of the COMS system so long as it "has an impact on the ability of the COMS or DAHS to collect, record, or store valid opacity monitoring data."[11] Pl.'s MSJ Ex. 4, at 10 (ECF No. 193-4). However, application of the repair exception to equipment outside the COMS is inconsistent with EPA regulations that explicitly state that the exception only applies to the specifically identified components of the COMS, which are the opacity monitor and the DAHS. 40 C.F.R. § 72.2. Therefore, the repair exception cannot apply if the breakdown was not in the monitor or DAHS. Accordingly, the Court should define a period of repair to mean the time when actions are taken to fix an unforeseeable, sudden and unavoidable breakdown of the COMS or the DAHS.

### b. Calibration

The purpose of calibration is to "assure accurate opacity readings and data validity." Def. Mot. Summ. J. ("Def.'s MSJ"), at 23-24 (ECF No. 191-1). The calibration exception should apply only when it is necessary to have the COMS in calibration mode to assure that it is producing accurate and valid data.

The Court should not permit Xcel's application of the exception to excessive and unnecessary calibrations. For example, in the EER for the fourth quarter of 2004 Xcel reported an extended period of downtime spanning from October 22 to October 25. During this period Xcel asserted calibration for multiple instances even though the monitor was not running before or after the calibration period. In situations like this calibration is unnecessary because the

---

[11] For example, Xcel claims that the repair exception applies to monitor downtime caused by failures of the personal logic computer and failures of the power supply. Pl.'s MSJ Attachment 9 to Ex. 5, at 43-106, 338-410 (ECF No. 193-5).

COMS remains down and therefore is not providing accurate and valid data when the calibration is complete. Additional evidence of Cherokee Station's unnecessary calibration downtime is illustrated in the plant's calibration procedure spanning two downtime intervals, where calibration by Xcel's other plants was limited to one interval. John Martinez, who is responsible for the COMS at Cherokee Station, acknowledged that the extra periods of calibration were problematic. According to Mr. Martinez, "it just seemed like something was wrong . . . once I learned that other plants didn't have the same issue." Ex. 3 at 9. If the exception is allowed to apply when the COMS is unnecessarily in calibration mode, then any monitor downtime event could be shielded simply by calibrating at will.

The Court should define the calibration exception as limited to (1) necessary and regularly scheduled calibrations, such as the daily calibration, that are required by 40 C.F.R. § 60.13(d) and (2) a period of calibration when the COMS comes back online and starts providing valid data after a legitimate monitor downtime.

### *c. Quality Assurance*

The quality assurance exception must be defined in a way that gives meaning to the "continuous" monitoring requirement in the CAA. Accordingly, monitor downtime should be avoided during quality assurance activities. Xcel, however, uses the exception even when a downtime could be avoided. For example, when Xcel installed new monitors on all four of its units, the installation caused no monitor downtime on units 2 and 3, however it caused 1066 periods of monitor downtime for units 1 and 4. Def.'s MSJ Ex. N (ECF No. 191-15). Xcel was able to avoid downtime during the installation on units 2 and 3, demonstrating that monitor downtimes are avoidable during monitor installation and should not be covered by the exception.

Xcel does not use the quality assurance exception in 40 C.F.R. § 75.10(d) in a way that gives it a distinct meaning from preventative maintenance and calibration. Xcel uses the quality assurance exception during calibrations and when data is lost due to preventative maintenance. Def.'s MSJ Ex. N (ECF No. 191-15). Xcel categorizes preventative maintenance and calibration

6

activities as subsections of "Quality Assurance/Quality Control" in its CEMS Quality Assurance Quality Control Manual, however for the purpose of using the terms as exceptions, the definitions of terms must be distinct. Ex. 4.

EPA intentionally made quality assurance a separate exception to the continuous monitoring requirement and therefore the Court should interpret it as distinct from the other exceptions. 40 C.F.R. § 75.10(d). It is a basic rule of construction that meaning should be given to every word, clause and sentence of a statute. *United States v. Menasche*, 348 U.S. 528, 538 (1955). The same principle of construction applies to regulations. *Silverman v. Eastrich Multiple Investor Fund,* 51 F.3d 28, 31 (3rd Cir. 1995) (holding that a basic tenet of regulatory construction is that a text "should be construed so that effect is given to all its provisions, so no part will be inoperative or superfluous").

The Court should define the quality assurance exception as applying to planned, systematic activities, other than calibration or preventative maintenance, that require the COMS to be down to make the monitor data or the monitor itself more accurate or reliable.

### #2.   Xcel Bears the Burden of Establishing the Applicability of Continuous Opacity Monitoring Exceptions.

Xcel bears the burden of establishing the applicability of the previously discussed exceptions to the continuous opacity monitoring requirement. *See Anderson v. Farmland Indus.*, 70 F. Supp. 2d 1218, 1225-26 (D. Kan. 1999) (citing *United States v. First City Nat'l Bank*, 386 U.S. 361, 366 (1967)) (holding that the burden of proof for establishing applicability of CAA exceptions rests with the owner/operator). 40 C.F.R. § 75.10(d) mandates that monitoring take place at all times except under the conditions described therein. Both the regulation and the Operating Permit contain identical language clearly identifying these conditions as exceptions.[12]

---

[12] Immediately following the list of circumstances under which monitoring is not required, both the regulation and the permit include the following language: "The permittee shall also ensure, subject to the *exceptions* just noted . . . ." 40 C.F.R. § 75.10(d) (2011); 2007 Permit § II.10.2.1 (emphasis added).

40 C.F.R. § 75.10(d) (2011); 2007 Permit § II.10.2.1. Here, where Xcel is seeking the benefit of the opacity monitoring exceptions, Xcel bears the burden of proving that the exceptions apply.

Furthermore, as a policy concern, if the plaintiffs in CAA cases were required to bear the burden of proving the exceptions do not apply, the defendant would be able to assert the exceptions without any corresponding incentive to collect relevant data. The lack of data would, in turn, severely undermine plaintiffs' ability to file suit because there would be little, if any, proof to support a claim that violations were not excusable.

The express exception language in the permit and the regulation, existing precedent, and policy concerns for preserving the CAA's citizen suit provision all point to a finding that Xcel bears the burden for proving the applicability of the monitoring exceptions in 40 C.F.R. § 75.10(d).

**B. ISSUES RELATED TO OPACITY EXCEEDENCE CLAIMS**

**#3. Xcel is Unable to Rely on the "Upset" Exemption for Opacity Exceedances and May Only Rely on the "Malfunction" Affirmative Defense for Exceedances Occurring After October 6, 2008.**

In addition to opacity monitoring exceptions, the Operating Permit contains limited provisions for narrowly defined circumstances when owners and operators may not be subject to civil penalties for opacity violations.[13] At issue here are the upset exemption[14] and the malfunction affirmative defense.[15] The upset exemption is not available to Xcel for any opacity violations. The malfunction affirmative defense is available to Xcel only for violations occurring after the EPA approval date of October 6, 2008. These provisions are distinct from one another both in method of application and in availability.

---

[13] The provisions in the 2007 Operating Permit include affirmative defenses for periods of malfunction (General Permit Condition 4(d)), startup and shutdown (General Permit Condition 4(g)), and emergency (General Permit Provision 5).

[14] The upset exemption appeared in all versions of the permit prior to 2007, when it was replaced by the malfunction affirmative defense.

[15] Xcel has claimed that 56 of the violations at issue fall under the upset exemption and an additional four under the malfunction affirmative defense. Def.'s MSJ Ex. N (ECF No. 191-15).

8

First, upset is an **<u>exemption</u>** to federal enforcement of alleged opacity violations. Unlike affirmative defenses, which serve to define narrow rules under which violations may be excused from liability, exemptions operate outside of general rules, serving to abrogate obligations to comply with regulatory schemes without resulting in liability. Since 1977 EPA has consistently maintained the position that exemptions, such as the upset exemption in the original CO SIP and Cherokee Station's pre-2007 Operating Permits, are inconsistent with the purposes of CAA monitoring requirements. Ex. 5 at 3. Furthermore, EPA acknowledges that exemptions disincentivize owners and operators from maintaining adequate or better operating and maintenance procedures and may prevent attainment and maintenance of National Ambient Air Quality Standards ("NAAQS"). *See* 42 Fed. Reg. 58171; Ex. 5 at 1, 2.[16][17]

In 2001, prior to the issuance of Cherokee's first operating permit in 2002, EPA identified the specific upset provision in the CO SIP as problematic, not in conformance with CAA requirements, and in need of revision. 73 Fed. Reg. 45879, 45870. In 2005, the plaintiff in this case petitioned EPA to issue a SIP call[18] requiring Colorado to revise the upset exemption. *Id*. Given the upset exemption's deficiencies, EPA's repeated instruction to Colorado to revise the exemption, and EPA's consistent stance that exemptions are prohibited, the Court should find that the upset exemption is not available to Xcel for the fifty-six opacity violations for which

---

[16] Additionally, while upset was included in the original 1972 Colorado SIP, it is not applicable to the Title IV and V requirements at issue in this case, which did not become part of the regulatory regime until the 1990 CAA amendments. 42 U.S.C. §§ 7651-7661f.

[17] Under other environmental statutory schemes, for example the Clean Water Act ("CWA"), courts have consistently invalidated regulations that operate as exemptions. *See*, *e.g.*, Nat'l Cotton Council of America v. EPA, 553 F.3d 927, 940 (6th Cir. 2009) (invalidating EPA rule exempting pesticide residue from permitting requirements because "the statutory text of the Clean Water Act forecloses the EPA's Final Rule"); N. Plains Res. Council v. Fidelity Exploration & Dev. Co., 325 F.3d 1155, 1164 & n. 4 (9th Cir. 2003) (stating "[o]nly Congress may amend the CWA to create exemptions from regulation").

[18] Under 40 C.F.R. § 52.31, EPA may call on a state to revise its previously approved SIP in order to correct provisions that are inadequate for NAAQS attainment or maintenance, or that fail to otherwise comply with the CAA.

Xcel has asserted the exemption.[19]

Second, the malfunction affirmative defense, which replaced the upset provision in the Operating Permit issued in May 2007, is only available for violations occurring after October 6, 2008, the date EPA's approval of this defense was made effective. 73 Fed. Reg. 45879. Courts have consistently recognized that SIP revisions do not become effective until they receive EPA approval. *See Sierra Club v. Korleski*, No. 2:08-CV-865, 2009 WL 414160 *1, 4 (S.D. Ohio Feb. 17, 2009); *Citizens for a Better Env't v. Wilson*, 775 F. Supp. 1291, 1295 (N.D. Cal. 1991). The permit language itself states "that until such time as the U.S. EPA approves this provision into the . . . [SIP], it shall be enforceable only by the State." 2007 Permit § V(3)(d). Because EPA did not approve the malfunction affirmative defense until October 6, 2008, it was not effective prior to that date. Accordingly, Xcel may not rely on it prior to the effective date.

### #4. Xcel May Not Rely on the Upset Exemption or the Malfunction Affirmative Defense Where It Failed to Timely Report Exceedences to the State.

Not excepting Guardians' position discussed above in Section 3 that the upset exemption is not available to Xcel for any opacity violations, Xcel may not claim the availability of either the upset exemption or the malfunction affirmative defense where Xcel failed to comply with the applicable notice requirements of each. There are thirty-two opacity violations at issue in this case where Xcel's DAHS data and EERs reflect that it failed to provide oral and written notice of the violations to the State. Pl.'s MSJ at 14. Xcel should not be permitted to assert an exemption or affirmative defense for any of these violations.

The 2002 Operating Permit contained explicit notice requirements under which opacity violations that occur under upset conditions would be exempted and not considered a violation "provided the Division is notified as soon as possible, but not later than two (2) hours after the

---

[19] These fifty-six violations occurred between November 13, 2004 and September 21, 2008.

start of the next working day," to be followed up by written notice. 2007 Permit § V(3)(d). [20]
Where Xcel failed to comply with this express notice requirement, it cannot claim an upset exemption.

Similarly, where notice requirements were not satisfied under the malfunction affirmative defense, Xcel cannot rely on the defense. In the EPA memo from which the Operating Permit affirmative defense elements are drawn, EPA clearly states (1) that all opacity exceedances are violations, but that (2) in certain narrowly defined circumstances an affirmative defense may be available to the defendant for the purposes of being relieved of civil liability for violations. Ex. 5 at 2-4. The affirmative defense language in the permit requires satisfaction of a list of objective criteria that includes timely reporting to the State no later than noon of the State's next working day after the violation, with written notification to follow by the end of the plant's next reporting period. 2007 Permit § V(3)(d). Where Xcel failed to satisfy the express notification requirements of this permit condition, it should precluded from relying on the malfunction affirmative defense.

Additionally, the failure to satisfy all of the procedural elements of the affirmative defense constitutes a waiver of the defense. *See Renfro v. City of Emporia*, 948 F.2d 1529, 1539 (10th Cir. 1991) (holding that a failure to satisfy the proper procedure by not pleading an affirmative defense in a timely manner is an effective waiver). Accordingly, because Xcel failed to comply with the applicable notice requirements of the upset exemption and malfunction affirmative defense, it has effectively waived the defense.

### #5. Xcel Bears the Burden of Establishing the Applicability of the Upset Exemption or the Malfunction Affirmative Defense to Specific Alleged Opacity Violations.

If the Court finds that the upset exemption is available to Xcel, as an exemption, the burden for establishing its applicability rests with Xcel as the party claiming its benefit. *See Anderson*,

---

[20] This is the language in Cherokee's original 2002 permit. Though the permit was revised four times between 2003 and 2006, this provision remained unchanged until it was replaced with the malfunction affirmative defense in the 2007 permit.

70 F. Supp. 2d at 1225-26; *In re Pacificorp's Jim Bridger & Naughton Electric Utility Steam Generating Plants*, No. VIII-00-1, 2000 WL 35832349 (E.P.A. Nov. 16, 2000) *1, 4 (stating "the burden of justifying the exemption lies with the party seeking or invoking it").

The malfunction affirmative defense, however, may apply to opacity violations. The Operating Permit clearly states "[t]o establish the [malfunction] affirmative defense . . . the owner or operator of the facility must meet the notification requirements . . . in a timely manner and prove by a preponderance of the evidence that . . . " all ten elements and the notice requirement of the defense provision were met. 2007 Permit § V(3)(d); *see, e.g.*, *Brownlow v. Aman*, 740 F.2d 1476, 1486-88 (10th Cir. 1984) (holding that a defendant must prove its affirmative defenses by a preponderance of the evidence). Accordingly, Xcel bears the burden of establishing the applicability of the malfunction affirmative defense.

**#6. Violations of Condition 11.2 Are Measured in Sixty-Minute Increments.**

Operating Permit Condition 11.2 requires calculations based on increments of "any sixty (60) consecutive minutes" during which opacity was greater than 30% for more than six minutes. 2007 Permit § II.11.2. The distinction between Guardians' and Xcel's interpretations of this provision centers on the overall timeframe of the period examined for potential opacity limit violations. Under Guardians' application of the provision, **any** sixty-minute period must be reviewed to determine whether opacity exceeded 30% for more than six minutes. If so, a violation has occurred.

In contrast, Xcel interprets 11.2 to mean that violations are based on six-minute increments, rather than sixty-minute increments. Xcel's interpretation also includes a "once-per-hour" exception to the 30% opacity limit.[21] [22] Using the "once-per-hour" exception, Xcel would automatically exclude the first exceedance and then begin the review period. Under this

---

[21] Under Condition 11.2, during periods of building a new fire, cleaning of fire boxes, soot blowing, start-up, process modifications or adjustment or occasional cleaning of control equipment, the standard 20% opacity limit will be increased to 30%.

[22] There are thirty-five violations at issue here that Xcel claims are excluded under its "once-per-hour" reading of Condition 11.2. Pl.'s MSJ Ex. 5 Attach. 3 (ECF No. 193-3).

framework Xcel would exclude the same number of readings over 30% whether it had two readings spaced exactly sixty minutes apart, or whether it had multiple readings over 30% in a sixty minute window.[23]  Even if Xcel is correct that violations are based on six minute periods, still its approach fails to distinguish between such cases and looks only to how recently a high opacity reading was thrown out, rather than how recently one occurred.

   Moreover, there are two reasons why Xcel's interpretation of the relevant time period must fail.  First, the plain language of Condition 11.2 requires the timeframe to include *any* sixty-minute period, rather than just the sixty minutes following an excluded violation.  Second, this interpretation is incorrect because the plain language of 11.2 does not create a "once-per-hour" exception.  Furthermore, as discussed in Guardians' Reply in Support of Its Partial Motions for Summary Judgment, where EPA intended to grant a "once-per-hour" exception to opacity limits, it has expressly done so in language that is notably different from the language in Condition 11.2.  Pl.'s Reply Supp. Partial Mot. Summ. J., at 6-7, n. 7, (ECF No. 213).

//

---

[23]

|  | 5:00 | 5:06 | 5:12 | 5:18 | 5:24 | 5:30 | 5:36 | 5:42 | 5:48 | 5:54 | 6:00 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Example 1** | X |  |  |  |  |  |  |  |  |  | X |
| **Example 2** | X |  | X |  | X |  | X |  | X |  | X |

"X" represents an opacity level in excess of 30%.  Assuming no violations occurred before 5:00 or after 6:00, both parties would agree that under Example 1 no violations of 11.2 occurred. Xcel would exclude both the 5:00 and 6:00 exceedances under its "once-per-hour" exception. Guardians would find no violation because there is no sixty-minute window in which opacity exceeds 30% for more than six minutes.  Under Example 2, parties disagree about the number of violations.  Xcel would count four violations because after the initial exceedance is thrown out at 5:00 there are four additional exceedances before the next exceedance can be excluded when the review period restarts at 6:00.  Guardians would find that there are sixteen violations because there are sixteen different sixty-minute windows in which two violations occur. Under Guardians' interpretation violations occur in the following sixty-minute windows: (1) 4:18-5:18; (2) 4:24-5:24; (3) 4:30-5:30; (4) 4:36-5:36; (5) 4:42-5:42; (6) 4:48-5:48; (7) 4:54-5:54; (8) 5:00-6:00; (9) 5:06-6:06; (10) 5:12-6:12; (11) 5:18-6:18; (12) 5:24-6:24; (13) 5:30-6:30; (14) 5:36-6:36; (15) 5:42-6:42; and (16) 5:48-6:48. During each sixty-minute window listed there were two or more exceedances, making each of those sixty-minute periods a violation.

### #7.   Xcel Bears the Burden of Establishing the Applicability of an Increased Opacity Limit Under Condition 11.2.

As noted above, under certain circumstances Condition 11.2 allows for an increase from the standard 20% opacity limit to 30%. Where Xcel asserts the applicability of the 30% opacity limit it bears the burden for proving that relevant conditions existed. This is consistent with a reading of the Operating Permit that includes consideration of both Conditions 11.1 and 11.2. Together, these conditions comprise the "Opacity Requirements and Periodic Monitoring" section of the Operating Permit.   At issue here are fifty-one violations for which Xcel has claimed start-up conditions warranted a 30% opacity limit.   Xcel Resp. Interrogs. tbl. 2.

First, Condition 11.1 establishes a 20% opacity limit that is applicable at all times "[e]xcept as provided for in Condition 11.2." This language is identical to that which creates exceptions to continuous monitoring under 40 C.F.R. § 75.10(d).[24] Next, Condition 11.2 goes on to list the particular exceptions, including start-up, under which the increased 30% opacity is applicable. As discussed and supported above in Section #2, where a party seeks to avail itself of an exception, that party bears the burden of showing the existence of the exception conditions.

Additional support for a finding that Xcel bears the burden of establishing the applicability of a higher opacity limit can be found in the Operating Permit's provision of an "Affirmative Defense for Excess Emissions During Startup and Shutdown." 2007 Permit § V.3(d).  EPA provided guidance on the start-up affirmative defense in a 1999 Memorandum.  Ex. 5 at Attach. 5-6. EPA states that under the start-up affirmative defense "the defendant has the burden of proof of demonstrating that" the criteria of the defense have been met. *Id*. Identification of start-up as an event for which an affirmative defense is appropriate indicates the burden for establishing startup conditions rests with Xcel.  The Court should, therefore, find that Xcel bears the burden for demonstrating the applicability of the increased opacity limit in Condition 11.2.

---

[24] Continuous monitoring is required "at all times . . . *except* as provided in § 75.11(e) and during periods of calibration, quality assurance, or preventive maintenance, . . .  periods of repair, periods of backups of data from the data acquisition and handling system, or recertification . . . ." 40 C.F.R. § 75.10(d) (emphasis added).

### #8. Opacity Limits Are Applicable When the Unit is Offline.

Violations of opacity limits are not excused when the unit is offline. Permit Condition 11.1 applies at all times without exception other than the limited circumstances under which Condition 11.2 applies. Condition 11.2 does not include an exception for the unit being offline. Because the eight relevant opacity violations at issue in this case occurred under circumstances outside those described in Condition 11.2, the 20% opacity limit set forth in Condition 11.1 controls. Guardians will address this issue in more detail if necessary in its Response Brief.

### C. Guardians Gave Sufficient Notice for Claims of Monitor Downtime.

Guardians' claims against Xcel are for monitor downtime and opacity exceedances. *See* Compl. ¶¶ 58-63. Guardians' notice letter meets every applicable requirement in this case because it identified (1) the specific standard at issue - Cherokee Station's Title V permit under the CAA; (2) the activity alleged to be in violation - monitor downtime and opacity violations; (3) the party responsible - Xcel; (4) the location of the violations - Cherokee Station; and (5) the dates of these violations - the preceding five years. 40 C.F.R. § 54.3(b); *see also Sierra Club v. Tristate Generation and Transmission Ass'n,* 173 F.R.D. 275 (D. Colo. 1997).

Xcel incorrectly frames the issue by asserting that Guardians is precluded from pursuing calibration downtime claims because Guardians acknowledged in its notice letter that Xcel is justified in following the calibration requirements in 40 C.F.R. § 60.13(d). Def.'s MSJ 14, (ECF No. 191-1). Guardians is not bringing claims for calibration downtime. It is bringing claims for monitor downtime events. As discussed above, Xcel has the burden of establishing that the exceptions apply to specific monitor downtime events. It would be inappropriate to decide at this point in the litigation whether the calibration exception applies because the Court has not decided on the definition of calibration and Xcel has not met its burden. Xcel should assert the exception as a defense at trial in accordance with the Court's decision on the definition of calibration.

DATED: September 24, 2012

Respectfully submitted,

/s/ Kevin J. Lynch
Professor Kevin J. Lynch
Sarah A. Barth*
Laurie M. Strong*
Leigh B. Auerbach*
Ryan T. Coyne*
ENVIRONMENTAL LAW CLINIC
UNIVERSITY OF DENVER
STURM COLLEGE OF LAW
2255 East Evans Avenue
Denver, Colorado 80208
(303) 871-6140 (telephone)
(303) 871-6847 (facsimile)
klynch@law.du.edu
sbarth13@law.du.edu
lstrong14@law.du.edu
lauerbach13@law.du.edu
rcoyne13@law.du.edu

Lino S. Lipinsky de Orlov, Esq.
Herbert L. Fenster, Esq.
MCKENNA LONG & ALDRIDGE LLP
1400 Wewatta Street, Suite 700
Denver, Colorado 80202
(303) 634-4000 (telephone)
(303) 634-4400 (facsimile)
llipinsky@mckennalong.com
hfenster@mckennalong.com

COUNSEL FOR PLAINTIFF,
WILDEARTH GUARDIANS

*Pending this Court's grant of Plaintiff's Unopposed Motions for Leave to Appear

## CERTIFICATE OF SERVICE

    I certify that on this 24th day of September 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Kent Mayo
William Bumpers
Brook Detterman
David Super
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue Northwest
Washington, D.C. 20004
kent.mayo@bakerbotts.com
william.bumpers@bakerbotts.com
brook.detterman@bakerbotts.com
david.super@bakerbotts.com

Colin C. Diehl
Linda Rockwood
Ann E. Prouty
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
cdiehl@faegre.com
lrockwood@faegre.com
aprouty@faegre.com

ATTORNEYS FOR DEFENDANT

                                                        /s/ Kevin J. Lynch